UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA

-vs-                                                             Case No. 3-:05-CR-051

LUIS A. LEY TORRES
MICHAEL HYDE                                           Judge Thomas M. Rose
_____   _____

**ENTRY AND ORDER OVERRULING DEFENDANTS LUIS A. LEY TORRES AND MICHAEL HYDE'S JOINT MOTION TO SUPPRESS (Doc. #25)**
_____

Defendants Luis A. Ley Torres ("Torres") and Michael Hyde ("Hyde") are each charged with one count of conspiracy to possess with intent to distribute more than 100 kilograms of a schedule I controlled substance in violation of 21 U.S.C. §841(a)(1) and (b)(1)(B) and 846, one count of possession with intent to distribute in excess of 100 kilograms of marijuana in violation of 21 U.S.C. §841(a)(1) and (b)(1)(B), and one count of interstate and foreign travel and transportation in aiding of racketeering enterprise in violation of 18 U.S.C. §1952. Those charges stem from the stop by a trooper of the Ohio State Patrol of the tractor-trailer rig in which Torres and Hyde were traveling on Interstate 70 in Preble County, Ohio, on October 7, 2004. After stopping the tractor-trailer rig, the trooper searched it and discovered over 1000 pounds of marijuana in bags in the trailer.

Now before the Court is the Joint Motion To Suppress filed by Torres and Hyde. (Doc. #25.) Torres and Hyde seek to suppress the evidence seized by the trooper during the stop. The Court conducted an oral and evidentiary hearing on this Motion on September 15, 2005. The

Parties have now filed post-hearing memoranda and the Motion To Suppress is ripe for decision. The Court now rules upon the Motion beginning with the Court's factual findings.

## FINDINGS OF FACT

On October 7, 2004, Trooper Larry Barrett ("Trooper Barrett") was on patrol in Preble County, Ohio with his drug detection canine, Banchee. At the time, Trooper Barrett was assigned to the Ohio State Highway Patrol Criminal Patrol Tactical Unit, District 5, as a drug detection canine handler. In this assignment, Trooper Barrett focused upon preventing traffic accidents, public safety on interstate highways and roadways and drug interdiction on the interstate highway system.

At approximately 10:04 a.m. while traveling westbound on Interstate 70 near the Ohio-Indiana border, Trooper Barrett noticed the eastbound tractor-trailer rig in which Torres and Hyde were riding. Trooper Barrett noticed the tractor-trailer rig because the windows on the tractor were tinted, the tractor was purple in color, the rig had Florida plates, there was shadowing on the trailer indicating that previous lettering had been removed and two of the registration numbers on the tractor had been taped over and some of the tape was flapping in the wind.

Based upon these observations, Trooper Barrett decided to investigate. He crossed the median at a paved cross-over and began to pursue the tractor-trailer rig. Trooper Barrett caught up to the tractor-trailer rig after about one mile.

Trooper Barrett then conducted a speed pace using his radar and determined that the tractor-trailer rig was traveling at a speed in excess of the posted speed limit. While conducting the speed pace, he observed that the right rear trailer tires crossed over the southern most edge line onto the rumble strips. The outer wheel completely crossed over the line and the inner wheel

crossed over partially. No signal was given that the truck was leaving its lane. After observing these traffic violations, Trooper Barrett effected a traffic stop of the tractor-trailer rig. The tractor-trailer rig was stopped at approximately 10:05 a.m.

After stopping the tractor-trailer rig, Trooper Barrett radioed the Florida registration information from the trailer license plate into the Highway Patrol Post and informed them of his location. He then exited his patrol car and motioned for the driver of the tractor-trailer rig to exit the tractor. Hyde, who was driving the tractor, exited the tractor and met Trooper Barrett at the rear of the trailer.

Trooper Barrett next asked Hyde for his driver's license. Hyde then began looking in his billfold for his license. Trooper Barrett noticed that Hyde "fumbled" across the license and that Hyde's hands were shaking.

Trooper Barrett explained to Hyde that he had been stopped for speeding and for a lane violation. Trooper Barrett then asked for the bills for the load, for Hyde's log book and for the registration for the tractor.

As Hyde began to approach the tractor to retrieve the requested information, he produced a temporary commercial driver's license issued by Florida. This temporary license had been issued about two months prior and was a second issue.

About that same time, Torres exited the tractor and began to walk toward Trooper Barrett and Torres. Hyde informed Trooper Barrett that Torres was a "co-driver" and was also Hyde's trainer. Further, Torres informed Trooper Barrett that he owned the trailer and that it was in Hyde's name and they were in business together.

The three then approached the front right side of the tractor so that Hyde could retrieve the bills for the load, his log book and the vehicle registration. When Hyde opened the door and began to enter the tractor, Trooper Barrett observed a bottle of Febreze lying in plain view. Trooper Barrett testified that the only time he had seen Febreze in a vehicle that was not on its way home from the grocery in a grocery sack, narcotics had been present.

Hyde then returned with the requested information and provided it to Trooper Barrett. Trooper Barrett asked if Torres had been driving and was told that he had been. Trooper Barrett then asked Torres for his driver's license and his log book.

Trooper Barrett next spoke with Hyde and Torres about where they were coming from and going to. They indicated that they were coming from Tempe, Arizona. They further indicated that they were hauling Dollar Store merchandise and had two drops in New Jersey.

During this discussion, Trooper Barrett noticed that Torres was beginning to sweat about his forehead and neck. The temperature at the time was about 65 degrees and Torres was wearing a t-shirt and shorts. Neither Trooper Barrett nor Hyde were sweating. Trooper Barrett related Torres' sweating to nervousness.

Based upon the presence of the Febreze, the nervousness and the fact that Torres and Hyde were coming from a source area known for narcotics, Trooper Barrett began to wonder if narcotics were present in the tractor-trailer rig. Hyde volunteered that the reason they were running from Arizona to the East Coast was that there was no freight being moved out of Miami. The volunteering of this information made Trooper Barrett even more suspicious.

Trooper Barrett then headed back toward his patrol car with the information. On the way back to his patrol car, Trooper Barrett noticed that two of the right side trailer tires were defective.

The tires had bald spots and the recap appeared to be separating from the sidewall on one of the tires. Trooper Barrett asked Hyde to look at the tires. Hyde looked at the tires and then told Trooper Barrett that they had been in that condition for about 4 months.

Trooper Barrett then returned to his patrol car and radioed both driver's licenses to the Highway Patrol post. Trooper Barrett asked that criminal histories be run in addition to the license check. This radio call took place at approximately 10:17 a.m. or about 12 minutes into the stop.

Trooper Barrett also reviewed the documents that had been provided by Hyde and Torres. He does not remember whether he reviewed the documents before or after calling in the driver's license information but he does recall that the entire process of reviewing the documents and calling in the driver's license information took between 3 to 5 minutes to complete.

Trooper Barrett's review of the documents revealed several facts. First, neither of Hyde's or Torres's logs reflected anything for October 3. Also, the logs for October 2 show the two in Tucson, Arizona and the logs on October 4 begin with both of them in Tempe, Arizona with no indication of how or when they got from Tucson to Tempe. Finally, the logs show Hyde and Torres leaving Tempe with the load on October 4 and the bills of lading for the load are dated October 5, one day later.

Trooper Barrett indicated that he did not expect a quick response to his call to the Highway Patrol on the driver's licenses, particularly where the licenses are from out-of-state. Rather than sitting in his patrol car and waiting for that response, Trooper Barrett decided to walk his drug detection dog, Banchee, around the tractor-trailer rig. This "walk" began at about 10:17 a.m., 12 minutes after the stop and immediately after Trooper Barrett called in the driver's license information.

Trooper Barrett first conducted a "free search" of the tractor-trailer rig. The "free search" consisted of walking Banchee around the outside of the tractor-trailer rig without "working" Banchee. Banchee did not "alert" during the free search.

After the "free search," Trooper Barrett and Banchee began a "directed" search of the tractor-trailer rig. In a directed search, the dog is directed to specifically sniff a certain location. The "directed" search was conducted around the tractor and the trailer.

Banchee alerted to the left front area of the tractor. An alert is a change in the dog's body posture behavior to a stimulus target odor. In this case, Banchee aggressively scratched the area around the driver's side door seam and the bunk area. Banchee was then returned to the cruiser.

Trooper Barrett next explained to Hyde and Torres that Banchee had alerted to the tractor-trailer rig and requested the key for the lock on the trailer rear door. After initially hesitating, Hyde told Trooper Barrett that the key was in the top bunk area of the sleeper berth in a small cubby hole. Trooper Barrett testified that the trailer keys are normally in the driver's pocket or on the center console of the truck to allow for quick access.

Trooper Barrett then checked Hyde and Torres for weapons and placed them in the rear seat of a patrol car that was on the scene. He then began his search of the tractor interior along with Trooper Weston, who had arrived on the scene.

Trooper Barrett found several items in the tractor that caught his attention. He found latex gloves lying about the interior of the bunk area. He found a roll of "industrial" cellophane underneath the bottom sleeper bunk. He found a can and solid air fresheners. Some of the air fresheners were found stuck in vents and others were hanging in the tractor. Finally, Trooper Barrett found multiple cell phones and a laptop computer.

Trooper Barrett testified that the "industrial" cellophane was the type used to wrap pallets of goods. Regarding the air fresheners, Trooper Barrett found a pack of cigarettes in Torres's pocket but he found no cigarettes or remnants thereof in the tractor nor did the tractor smell of cigarette smoke. Finally, Trooper Barrett found no evidence of narcotics or narcotics paraphernalia in the tractor.

Trooper Barrett next obtained the key to the rear door of the trailer and proceeded to open that door. The load on the left side of the trailer was crushed. Some of the load was on pallets and some was sitting on the floor of the trailer.

Upon entering the trailer, Trooper Barrett saw a duffel bag strap on the right toward the middle of the trailer. When looking further, Trooper Barrett saw multiple large, black duffel or "hockey" style bags. One of the bags was opened and was found to contain several layers of cellophane surrounding bulk amounts of marijuana. The 10 bags in total contained a gross weight of over 1000 pounds of marijuana.

Hyde and Torres were then arrested. After Hyde and Torres were on their way to jail, Trooper Barrett wrote Hyde a citation for crossing the white line.

## CONCLUSIONS OF LAW

Torres and Hyde assert three grounds for suppression of the marijuana evidence. They first assert that Trooper Barrett "really and only" stopped them as a subterfuge in order to allow Trooper Barrett to conduct a narcotics investigation. Second, they assert that the stop was unreasonably prolonged by Trooper Barrett. Finally, Torres and Hyde assert that Trooper Barrett did not have probable cause to search the trailer.

### The Initial Stop

Torres and Hyde first argue that the initial stop was a subterfuge to allow Trooper Barrett to conduct a narcotics investigation. However, "the legality of a traffic stop is not dependent upon an officer's subjective intentions." *Weaver v. Shadoan*, 340 F.3d 398, 407 (6th Cir. 2003) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). An officer may stop a vehicle for a legitimate traffic violation even though his true motivation may be to conduct a search for narcotics. *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002)(citing *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000)). The stop is valid as long as the officer had probable cause to initially stop the vehicle. *Id.*

In this case, Trooper Barrett had probable cause to initially stop the tractor-trailer rig. He observed the tractor-trailer rig to be speeding and he observed the tractor-trailer rig commit a lane violation. Whether Trooper Barrett's true intention was to conduct a narcotics investigation is immaterial. Therefore, the initial stop of the tractor-trailer rig for traffic violations did not violate Torres and Hyde's Constitutional rights.

### The Length of the Stop

A stop for a traffic violation can become unlawful it if is prolonged beyond the time reasonably required to complete issuance of a ticket for that violation. *Illinois v. Caballes*, 125 S.Ct. 834, 837 (2005). For example, a dog sniff conducted before a traffic ticket was written was not unlawful. *United States v. Johnson*, 123 Fed.Appx. 240, 2005 WL 589976 (7th Cir. Mar. 8, 2005), *cert. denied*, 126 S.Ct. 261 (2005). Another court determined that a canine alert within 5 or 10 minutes of a traffic stop would likely be reasonable while an alert 19 minutes into a traffic stop may not be reasonable. *United States v. Garrett*, 139 Fed.Appx. 720, 2005 WL 1621097 at **3

(Jul. 11, 2005). Finally, a 10 minute traffic stop that included a dog sniff was not unconstitutional. *Caballes*, 125 S.Ct. 834.

In this case, the stop was not unreasonably prolonged. Indeed, Trooper Barrett had not yet completed the traffic investigation when Banshee alerted.

Trooper Barrett stopped the tractor-trailer rig for traffic violations. He then asked Hyde, the driver of the rig, for his driver's license, his log book and for other documentation regarding the tractor-trailer rig and the load it was carrying. Torres then exited the tractor and Trooper Barrett had a conversation with him. Hyde then retrieved the requested information from the tractor and returned to where Trooper Barrett and Torres were waiting. Trooper Barrett then returned to his patrol car stopping on the way to point out to Hyde defective tires that he had discovered on the trailer. Upon returning to his patrol car, Trooper Barrett briefly reviewed the documents and radioed both driver's licenses to the Highway Patrol Post. This radio call took place at approximately 10:17 a.m. or about 12 minutes into the stop. These are not unreasonable activities associated with the traffic stop of a tractor-trailer rig traveling on an interstate highway and the twelve minutes that it took Officer Barrett to perform these activities is not unreasonable.

While he was waiting for the check being performed at the Highway Patrol Post, Trooper Barrett decided to perform a dog sniff of the tractor-trailer rig. It is not unreasonable to expect that the check of out-of-state licenses would take at least a few minutes. Further, Trooper Barrett began the dog sniff immediately after requesting the check by the Highway Patrol which was, again, about 12 minutes into the traffic stop. It was while Trooper Barrett was awaiting a response from the Highway Patrol that Banshee alerted to the odor of drugs. The traffic stop then ceased being a traffic stop and turned into a narcotics investigation.

The record does not indicate the length of time between when the dog sniff was initiated and when Banshee alerted. However, the record does indicate that the dog sniff was started at about 12 minutes into the traffic stop and the record does not indicate that the dog sniff was delayed. Further, Hyde and Torres are not challenging this period of time and specifically are not challenging the length of time taken by the Highway Patrol to respond to Trooper Barrett's request for a check of the out-of-state licenses.

Torres and Hyde argue that this Court suppressed evidence in a case almost identical to the case at bar. The case cited by Torres and Hyde is *United States v. Mendoza*, Case No. 3:03cr056 (S.D.Ohio Jul. 16, 2004). However, the facts in *Mendoza* are significantly different from the facts in this case. In *Mendoza*, the trooper admittedly ceased attempting to effectuate a traffic stop and began a criminal investigation. Here, Trooper Barrett's traffic investigation continued and the dog sniff took place while the traffic investigation was ongoing.

Torres and Hyde cite a case in which the Illinois Supreme Court rejected the State's contention that a dog sniff was justified because it occurred while the officer was in the process of writing the citation. *People v. Cox*, 782 N.E.2d 275 (Ill. 2002), *cert. denied*, 539 U.S. 937 (2003). In *Cox*, the officer called for a drug-sniffing dog when the traffic stop was initiated without any reason to believe that drugs were present in the vehicle. *Id.* at 468. The dog did not arrive until approximately 15 minutes after the traffic stop. *Id.* at 469. The *Cox* Court determined that the record did not include circumstances which would justify the 15-minute length of the traffic stop. *Id.* at 470. The Court then underscored that an officer may not stall at the scene of a traffic stop until a drug-sniffing dog arrives and creates probable cause to search a vehicle. *Id.* at 470.

The facts in this case are significantly different from the facts in *Cox*. In this case, the record includes circumstances justifying the time taken for the traffic stop and Officer Barrett was not waiting for a dog to arrive. Officer Barrett had the dog with him and conducted the sniff while waiting for a necessary part of the traffic investigation to take place.

Torres and Hyde also argue that the taking of Torres's license when he was not driving the truck is an indication that Trooper Barrett immediately began a criminal investigation. However, Trooper Barrett was told that Torres was a co-driver and he then asked for Torres's driver's license and log as part of his traffic investigation.

Torres and Hyde also argue that Trooper Barrett requested the driver's log books and the bills of lading to unnecessarily delay the traffic investigation. However, Trooper Barrett is authorized to conduct random inspections of commercial trucks for safety and proper documentation. Also, the crossing of the lane marker by the trailer caused Trooper Barrett to suspect that the driver may have been operating without enough sleep which may be revealed by the driver's log book.

The United States argues that, if the traffic stop was prolonged beyond Constitutional limits, the extra time taken was supported by objectively reasonable suspicion. However, since the traffic stop was not prolonged beyond Constitutional limits, the Court need not address whether Trooper Barrett's actions in making the dog sniff were supported by objectively reasonable suspicion.

In sum, the 12 minutes that it took for Trooper Barrett to request the license check is not an unreasonable length of time and the time period during which the dog sniff was conducted is not

an unreasonable length of time to wait for a response to the license check. Therefore, the length of the stop is not violative of Torres and Hyde's Constitutional rights.

Probable Cause To Search the Trailer

Torres and Hyde argue that Trooper Barrett did not have probable cause to search the trailer. The search of the trailer was based upon Banchee's alert to the area around the tractor door. The first issue is whether the dog sniff violated any Constitutional rights.

The Supreme Court has determined that a dog sniff would not "change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed" upon the defendant's constitutionally protected interest in privacy. *Id.* Further, any interest in possessing contraband cannot be legitimate and government conduct that only reveals the possession of contraband does not compromise a legitimate privacy interest. *Id.* at 839. (a dog sniff that does not expose contraband items that otherwise would remain hidden from public view during a traffic stop does not rise to the level of a constitutionally cognizable infringement).

In this case, the dog sniff was conducted during a legitimate traffic stop and, although the dog sniff revealed that narcotics were present, it did not expose the narcotics. Conducting the dog sniff, therefore, did not violate Torres and Hyde's Constitutional rights. Having determined that the dog sniff did not violate Torres and Hyde's Constitutional rights, the analysis turns to whether the search of the trailer violated Torres and Hyde's Constitutional rights.

In that regard, an alert by a properly trained dog is sufficient to establish probable cause for the presence of a controlled substance. *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994). In this case, there is evidence on the record that Banshee was properly trained and certified

to detect certain narcotics and Torres and Hyde do not challenge this training and certification. Therefore, Banshee's alert was probable cause to search for narcotics.

Torres and Hyde argue that, because Banshee alerted on the tractor and not the trailer, Officer Barnett had no probable cause to search the trailer. However, the Sixth Circuit has held that a canine's alert to the tractor of a tractor-trailer rig and not to the trailer was a reliable indication that illegal narcotics were present in the tractor or the trailer. *United States v. Ortega-Ramos*, 56 F.3d 65, 1995 WL 314889 at *3 (6th Cir. May 23, 1995).

The holding in *Ortega-Ramos* is supported by other cases which treat the tractor and trailer as one unit. *See, e.g.*, *United States v. Ervin*, 907 F.2d 1534, 1537-38 (5th Cir. 1990)(a warrant-less search of a trailer-camper hitched to the defendant's pickup truck did not violate the Fourth Amendment); *Aviles v. Burgos*, 783 F.2d 270, 276 (1st Cir. 1986)(the trailer becomes a single unit with the tractor when it is attached to the tractor and the tractor-trailer unit, as a whole, is considered a motor vehicle).

The holding in *Ortega-Ramos* is also supported by the circumstances surrounding a canine's alert. A canine responds to the odor of narcotics and not necessarily the presence of narcotics. Factors such as wind may cause the odor of narcotics to be somewhere other than the exact location of the narcotics.

Torres and Hyde argue that the dog in *Ortega-Ramos* alerted to both the tractor and the trailer. However, the *Ortega-Ramos* Court clearly reached its opinion based upon the defendant's claim that the dog failed to alert to the trailer. *Ortega-Ramos*, 1995 WL 314889 at *3.

Torres and Hyde finally argue that Trooper Barrett requested the keys to the trailer before searching the tractor and thus intended to search the trailer all along. However, Trooper Barrett requested the keys to the trailer after Banshee had alerted to the presence of narcotics.

Both Parties discussed the privacy expectations of the commercial trucking industry with regard to the search at length. However, the Court need not reach these arguments. Officer Barrett had probable cause to search the trailer based upon the legal dog sniff.

## CONCLUSION

Trooper Barrett conducted a legal traffic stop of the tractor-trailer rig being driven by Hyde and Torres for speeding and committing a lane violation. Trooper Barrett's "true motivation" for conducting the traffic stop is immaterial.

The 12 minutes between when the stop was made and when the traffic investigation turned into a narcotics investigation is not an unreasonable length of time for a traffic investigation of a commercial vehicle such as the one being driven by Hyde and Torres. Further, Hyde and Torres's Constitutional rights were not violated by the conduct of a dog sniff while the traffic investigation was underway.

Finally, Banshee alerted on the tractor. Trooper Barrett, therefore, had probable cause to inspect the inside of the trailer that was attached and being pulled by the tractor.

Hyde and Torres's Motion To Suppress is not well-founded. It is, therefore, OVERRULED.

**DONE** and **ORDERED** in Dayton, Ohio on this Twenty-Eighth day of December, 2005.

                 s/Thomas M. Rose

                _____
                 THOMAS M. ROSE
               UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
LUIS A. LEY TORRES
Michael Hyde